# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 4, 2019 Session

## STATE OF TENNESSEE v. SHELBY ISAAC

**Appeal from the Criminal Court for Shelby County**
No. 16-01734      James M. Lammey, Judge
_____

## No. W2018-00871-CCA-R3-CD
_____

Defendant, Shelby Isaac, was convicted of two counts of second degree murder, one count of reckless homicide, and one count of criminally negligent homicide after a jury found her guilty of killing three victims. The trial court sentenced Defendant to a total effective sentence of thirty years. On appeal, Defendant challenges the sufficiency of the evidence supporting her convictions, the admission of a photograph of an opened uterus, the admission of a witness's gang affiliation, the admission of a witness's jail phone call as a prior consistent statement, the admission of a photograph of Defendant standing next to a man making a hand gesture that Defendant claims is a gang sign, the trial court's denial of Defendant's motion for a continuance, the trial court's denial of Defendant's motion for mistrial, the propriety of the prosecutor's rebuttal closing argument, and the trial court's imposition of consecutive sentencing. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., joined. THOMAS T. WOODALL, J., filed a separate concurring opinion.

Lauren M. Fuchs (on appeal and at trial) and William Massey (at trial), Memphis, Tennessee, for the appellant, Shelby Isaac.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glenn Baity, Gavin Smith, and Jamie Kidd, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## *Factual and Procedural Background*

A Shelby County grand jury indicted Defendant for the first degree felony murder of Eddie Tate committed during the perpetration of an aggravated robbery in Count One, the first degree premeditated murder of Eddie Tate in Count Two, the first degree premeditated murder of Edwina Thomas in Count Three, and the first degree premeditated murder of the unborn child of Edwina Thomas in Count Four. Victoria Seay was also indicted with four violations of Tennessee Code Annotated section 39-11-411, accessory after the fact, in Counts Five through Eight. The following facts were adduced at trial.

Mr. Tate worked part time at his mother's hair weave business, Virgin Hair for You. Most of the business's sales were "out of the car" and primarily cash transactions. He charged fifty dollars for a twelve-inch "bundle" of hair and up to one-hundred dollars for a thirty-inch "bundle" of hair. Most of their customers would purchase at least three bundles at a time. If something was wrong with the hair, the business would allow returns and exchanges but not a return for a refund. From time to time, Mr. Tate would take Ms. Thomas, his girlfriend, with him when he would sell hair.

Ms. Seay, a friend of Defendant, testified on behalf of the State. She knew Defendant by her nickname, "Shay." According to Ms. Seay, on January 21, 2016, the night before the shooting, she and Defendant spent the night at the home of Gary Dotson. Ms. Seay and Defendant left Mr. Dotson's house between the hours of 12:00 p.m. and 2:00 p.m. As they left, Defendant told Ms. Seay that she was going to buy some hair. Ms. Seay gave Defendant a ride to a Texaco gas station in Ms. Seay's silver Mitsubishi Mirage. When Ms. Seay parked, Defendant exited the passenger side of the vehicle and walked over to a McDonald's. There, Defendant purchased some hair for $250 from Mr. Tate. Defendant returned to Ms. Seay's car, and Ms. Seay drove to Sycamore Lake Apartments where Defendant lived. Ms. Seay realized that she did not have her "hair bag" so she could not sew in Defendant's weave. They left and went back to Ms. Seay's house, which was about ten to twelve minutes away. Their attempt to retrieve Ms. Seay's "hair bag" was thwarted because neither Ms. Seay's mother nor Ms. Seay's grandmother was home, and Ms. Seay did not possess a key to her own house. She and Defendant then headed back toward Defendant's apartment.

On the way, Defendant mentioned to Ms. Seay that she would like to get three more "bundles" of hair and that she would like to get her money back. Defendant called the man that she bought the hair from, Mr. Tate, and she asked him to meet her at Sycamore Lake Apartments. Ms. Seay parked her car in the parking lot, and Defendant exited the car and walked over to Mr. Tate's car. Meanwhile, Ms. Seay got out of the car

- 2 -

too. From Ms. Seay's vantage point, she could only see Mr. Tate in his car holding three bundles of hair. According to Ms. Seay, the only people at the scene were Defendant, Mr. Tate, Ms. Thomas, and herself. Before Ms. Seay could get over to Defendant's location, she heard a gunshot and ran back to her car. As she turned to run, Ms. Seay saw a black gun in Defendant's hand. Ms. Seay got inside her car and drove to Deerfield Apartments. Ms. Seay called Defendant multiple times, and after about five to ten minutes, Defendant eventually answered. Ms. Seay asked Defendant what had happened, and Defendant told Ms. Seay to come pick her up in front of the apartments.

Ms. Seay immediately returned to the Sycamore Lake Apartments and picked up Defendant. According to Ms. Seay, Defendant's purse and a black jacket were located in the back seat of Ms. Seay's car. At trial, Ms. Seay recounted Defendant's statements during the car ride to Ms. Seay's house. She testified, "[Defendant] told me that she shot the man and that he was dead and that she had shot the lady. And that when the lady came back - - she had blacked out. And when she came back, then she told her that she was pregnant."

As Ms. Seay and Defendant were driving around after the shooting, they went to pick up Darrion Melvin, whom Ms. Seay calls her "play brother." At some point, Ms. Seay's mother called and asked why the police were at their house. Ms. Seay lied to her mother about the police and continued driving to Mr. Melvin's house. Upon arrival, Defendant entered Mr. Melvin's residence for "about a minute and a half" and then returned, according to Ms. Seay. According to Mr. Melvin, Defendant asked him if she could use the restroom. Mr. Melvin responded, "All right," and Defendant went to the restroom in his house, while he and Ms. Seay remained in Ms. Seay's car. At this point in time, Mr. Melvin did not notice anything unusual about Defendant.

Ms. Seay and Defendant took Mr. Melvin to run some errands. While Mr. Melvin was in the car, Ms. Seay spoke with Mr. Dotson on the phone. Mr. Melvin testified he heard Ms. Seay say to Mr. Dotson, "You can fix your own phone because you just hit a lick." Mr. Melvin understood "hitting a lick" to mean robbing someone. Mr. Melvin further described the conversation inside the car by testifying, "[Ms. Seay's] mama kept calling her. She was like, 'The police at my house' - - 'at the house. They need you to come home.' I was like, 'Dang. What's going on?' Then [Defendant] was like, 'Really, nothing. We got' - - 'We was in the apartments last night. They got to shooting.'" Defendant then turned to Ms. Seay and said, "They ain't got nothing but your tags, and you ain't got to worry about nothing."

While speaking to Defendant, Mr. Melvin was "checking her" and said, "Dang, you got your hair done and all that." Defendant responded, "[Mr. Melvin], shut up before I shoot you." Mr. Melvin thought that Defendant was not being serious. Mr. Melvin

noticed that Ms. Seay was acting strange. Eventually, Ms. Seay dropped Defendant off at "Craigmont" and dropped Mr. Melvin off at his house.

After Ms. Seay and Defendant left Mr. Dotson's house "sometime in the mid morning," Mr. Dotson had no interaction with Defendant until she returned several hours later that day. Mr. Dotson observed that Defendant looked "tired." Defendant was wearing "a jacket, a shirt, and some blue jeans." Mr. Dotson saw blood on Defendant's jacket and on the thigh of her pants. In Defendant's back pocket was a "bunch of money, just balled up." Defendant took off her clothes and put on a different shirt. She then walked into Mr. Dotson's bedroom, laid down a black and pink 9 millimeter Ruger pistol, lay on his bed, and went to sleep. Mr. Dotson noticed that the magazine of the pistol was not full. He estimated that there were three rounds in the magazine. Four or five hours later, Defendant woke up and left. Mr. Dotson did not see her again that day.

At approximately 3:00 p.m. on the day of the shooting, Officer D'Andre Johnson of the Memphis Police Department (MPD) responded to a shooting call at Sycamore Lake Apartments. When he arrived at the scene, he found a black male victim, Mr. Tate, who appeared to be dead. Officer Johnson was notified of a second victim. He found her in a separate apartment complex in the vicinity of the shooting. He observed that she had suffered a gunshot wound. The second victim, Ms. Thomas, was "bleeding profusely" from her left side. The woman was unable to provide Officer Johnson with much information or even her name and appeared to be in a state of shock. Officer Johnson also observed a green Honda parked in front of the location where he found the second victim. An ambulance was called to transport her to receive medical care. After being transported to a hospital, Ms. Thomas died several hours later.

MPD Sergeant James Smith was designated the case coordinator for this crime. He responded to a call that "there was a male black that was shot that was still on the scene deceased, and someone had left in his car." Once on the scene, Sergeant Smith spoke with the other responding officers and received information from dispatch that described a vehicle that had left the scene containing a possible suspect. Sergeant Smith spoke with multiple witnesses that claimed they saw the events after the shots were fired. Many of those witnesses testified at trial. From various vantage points, the multiple witnesses saw one woman get into a silver Mitsubishi and drive away. The witnesses also saw another woman pull a man out of the driver's seat of a green Honda and drive away. Through his investigation, Sergeant Smith discovered that the woman who pulled the driver out of the car was the second victim, Ms. Thomas, who had also been shot.

However, some of the witnesses' testimony differed in some respects. Noel Lopez, a resident of Sycamore Lake Apartments at the time of the shooting, saw a black male walking toward the Mitsubishi before it left. Mr. Lopez remembered seeing a black individual running away from the Mitsubishi after the gun shots. Mr. Lopez did not

remember seeing a male individual with the female that sped off in the silver Mitsubishi, but he could not be certain. Brenda Davis, another resident of the Sycamore Lake Apartments, testified she saw "what appeared to be a black man, sort of heavy built, running, like, away from this car. It seemed like he was jogging." He was wearing "a black and red jacket." According to Ms. Davis, the car, which was "neon green" and driven by a female, sped away from the man. Ms. Davis "assumed" that this man was the shooter. However, Ms. Davis later saw the same man in the "black and red jacket" lying face down in the parking lot. Defense witness Craig Hollis, another resident of the Sycamore Lake Apartments, testified he saw the same events unfold, but he described the person that drove away in the green Honda as a young woman, who was wearing "bright-colored" leggings with a "multi-colored pattern" and a "red toboggan."

Sergeant Smith was able to identify Ms. Seay as a suspect within an hour or two of arriving on the scene. The police arrested her and took her to the homicide bureau where she was put in an interview room and shackled to a bench. Ms. Seay sat in that room for more than two hours, and officers checked on her periodically. Eventually, Ms. Seay signed a waiver of rights and began speaking to the police. The police told Ms. Seay that witnesses had placed her and her car at the scene and then told her that she was being investigated as a suspect in a first-degree murder case. Around 2:00 a.m., Ms. Seay gave a statement to the police, which did not implicate Defendant. However, in this statement, Ms. Seay described Defendant as wearing a black shirt and a burgundy jacket. At trial, Ms. Seay admitted that her first statement was a lie.

Sometime after the day of her arrest, Ms. Seay contacted the police and gave a second statement that implicated Defendant. Ms. Seay's second statement directly contradicted portions of her first statement, and Ms. Seay admitted to the police that she had lied while giving her first statement. In this statement, Ms. Seay included that Defendant was wearing gold, glittery boots.

The call records that Sergeant Smith retrieved duirng his investigation revealed that there were eight phone calls between Defendant and Mr. Tate on the day of the shooting. The last number to call Mr. Tate's phone was Defendant's. The police processed both Ms. Seay's silver Mitsubishi Mirage and Mr. Tate's green Honda for evidence. Inside Ms. Seay's vehicle, the police found a black sweatshirt that had blood on it. DNA testing revealed that the blood matched Mr. Tate's DNA. Also found in Ms. Seay's vehicle was a styrofoam cup, which contained Defendant's fingerprint. Additionally, the police recovered a receipt from the passenger seat of Mr. Tate's green Honda that contained Defendant's fingerprint.

The police recovered several shell casings and bullets from the crime scene. Special Agent Kasiah Lynch of the Tennessee Bureau of Investigation Firearms Identification Unit examined six bullets and seven fired cartridge cases as a part of the

investigation of this case. Special Agent Lynch was able to determine that the 9 millimeter cartridge cases found at the crime scene were "likely" fired from the same make and model of firearm, but she could not determine whether the cartridge cases had been fired by the exact same firearm. From her examination of the recovered bullets, Special Agent Lynch was able to determine that a Ruger firearm was possibly the make of weapon that fired two of the bullets. The third bullet was in such condition that Special Agent Lynch could not make any determination as to the type of weapon that fired the bullet. Special Agent Lynch was ultimately able to determine that only one firearm was used.

The police also recovered a pair of gold sequined Ugg boots that belonged to Defendant. MPD Officer Jeffrey Garey conducted the "BlueStar" test for latent bodily fluid on the boots. Officer Garey testified that the "BlueStar" test will reveal the presence of blood even if the surface has been cleaned. The test results were negative, meaning no blood was found on the boots.

Dr. Marco Ross, the Assistant Medical Examiner for Shelby County, examined the body of Mr. Tate and determined that Mr. Tate had suffered four gunshot wounds, which were the cause of his death. Dr. Ross also examined the body of Ms. Thomas and determined that she had suffered a gunshot wound to the abdomen, the left forearm, and the left upper arm. Dr. Ross determined that the gunshot wounds to the abdomen and left forearm were the cause of Ms. Thomas's death. During his examination, Dr. Ross found that Ms. Thomas was in the first trimester of her pregnancy and that the fetus was six to seven weeks old. Dr. Ross determined that the fetus died as a result of Ms. Thomas's gunshot wounds.

Defendant did not testify. Other than the testimony of Mr. Hollis, Defendant presented the testimony of her older sister, Christy Isaac, that Defendant and her family had known Mr. Tate and his family for a long time. She, Defendant, and their mother all bought hair from Mr. Tate and his brother, Marion, in a "cash only business." She did not know if Defendant had ever bought hair from the Tates at Sycamore Lake Apartments. She stated that Defendant "most definitely" looked the same at trial as she did in 2016 with the exception that her hair was a bit shorter.

After deliberation, the jury found Defendant guilty of second degree murder in Count One, second degree murder in Count Two, reckless homicide in Count Three, and criminally negligent homicide in Count Four. The State filed a motion seeking consecutive sentencing, arguing that consecutive sentences were warranted because, "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Also, the State included in its motion a reference to *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), alleging that "[c]onsecutive sentences reasonably relate to the

severity of the offenses committed. . . [and] are necessary in order to protect the public from further serious criminal conduct by the defendant." After a sentencing hearing, the trial court merged Counts One and Two, and sentenced Defendant to twenty-four years in Count One. Additionally, the trial court sentenced Defendant to four years in Count Three and two years in Count Four. The trial court ordered consecutive service of all three sentences for a total effective sentence of thirty years. Defendant filed a motion for new trial, which the trial court denied. This appeal followed.

*Analysis*

*I. Sufficiency of the Evidence*

Defendant argues that the evidence is insufficient to support her convictions because Ms. Seay was the only witness to testify that Defendant was present at the scene of the crime. The State claims Defendant is merely asking this Court to reweigh Ms. Seay's credibility, something that this Court cannot do. Also, the State maintains that the evidence is sufficient. We agree with the State.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

To establish the elements of second-degree murder, the State had to prove that Defendant knowingly killed Mr. Tate. *See* T.C.A. § 39-13-210(a)(1). A person acts knowingly with respect to the result of their conduct "when the person is aware of that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-106(a)(20). For reckless homicide, the State had to prove that Defendant recklessly killed Ms. Thomas. *See* T.C.A. § 39-13-215(a). A person acts recklessly "when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." T.C.A. § 39-11-106(a)(31).

To establish criminally negligent homicide of Ms. Thomas's unborn child, "the State must prove three elements beyond a reasonable doubt: (1) criminally negligent conduct on the part of the accused; (2) that proximately causes; (3) a person's death." *State v. Briggs*, 343 S.W.3d 106, 109-10 (Tenn. Crim. App. 2010); *see* T.C.A. § 39-13-212. For purposes of the homicide statutes, another person "include[s] a human embryo or fetus at any stage of gestation in utero." T.C.A. § 39-13-214(a). Criminally negligent conduct is defined as "when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur." T.C.A. § 39-11-106(a)(4). "The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]" *Id.* The defendant must fail to perceive a substantial and unjustifiable risk in order to be found criminally negligent. *Briggs*, 343 S.W.3d at 110. "Whether a defendant failed to perceive the risk must be determined under the circumstances as viewed from the defendant's standpoint." *Id.* (citing T.C.A. § 39-11-106(a)(4)). A defendant's failure to perceive the risk must be a "'gross deviation from the standard of care.'" *Id.* (quoting T.C.A. § 39-11-106(a)(4)).

In addition to establishing the above elements for each crime, the State must prove that Defendant was the perpetrator beyond a reasonable doubt. *See State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (stating "identity of the perpetrator is an essential element of any crime"). "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). In resolving questions of fact, such as the identity of the perpetrator, "the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses." *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)).

Defendant essentially asks this Court to reevaluate Ms. Seay's credibility on appeal. That is not our role, but rather, the role of the jury. *Id.*; *Reid*, 91 S.W.3d at 277. Ms. Seay's testimony established that Defendant pulled the trigger on the gun that killed

Mr. Tate, Ms. Thomas, and Ms. Thomas's unborn child. Ms. Seay's testimony was corroborated by the fact that Defendant's fingerprint was present on a receipt that was recovered for Mr. Tate's green Honda. Additionally, Mr. Dotson testified that Defendant entered his home with blood on her clothes and a Ruger pistol that was not fully loaded. A Ruger pistol is one of the types of pistol that could have fired the bullets recovered from the crime scene. This evidence is sufficient for a rational juror to conclude beyond a reasonable doubt that Defendant committed second-degree murder, reckless homicide, and criminally negligent homicide.[1]

## II. Evidentiary Issues

Defendant argues that the trial court committed multiple errors when determining the admission of evidence throughout the trial. "Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). An abuse of discretion occurs when the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 933 S.W.2d 662, 669 (Tenn. 1997).

### A. Admission of Photograph of Fetus

Defendant argues that the trial court abused its discretion when it admitted a photograph of a fetus, the unborn child of Ms. Thomas. Defendant contends that the inflammatory and prejudicial nature of the photograph substantially outweighed the probative value of the photograph as evidence. The State replies that the trial court properly exercised its discretion in admitting the autopsy photograph of the fetus because it assisted in the jury's understanding of the medical examiner's testimony, which explained the that the fetus was also a victim of the shooting. We agree with the State.

Photographs must be relevant in order to be admitted into evidence. *State v. Thomas*, 158 S.W.3d 361, 394 (Tenn. 2005). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Said differently, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., *Tennessee Law of Evidence* §

---

[1] Because Defendant did not challenge any element other than Ms. Seay's identification of Defendant as the shooter in her initial appellate brief, the majority opinion addresses only the sufficiency of the testimony related to Defendant's identity as the shooter. *See* Tenn. Ct. Crim. App. R. 10(b). This Court requested supplemental briefing on the issue of whether the State had proven the mens rea for the criminally negligent homicide of Ms. Thomas's unborn child. That issue is more fully discussed in the concurring opinion.

4.01[4], at 4-8 (6th ed. 2011). However, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" Tenn. R. Evid. 403. Evidence unfairly prejudices a defendant when it suggests a decision an improper or emotional basis. *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978).

When considering the danger of unfair prejudice that resulted from the introduction of a photograph of a homicide victim's body, we consider the following:

> [T]he value of the photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id.* "The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." *Id.* (citing *Commonwealth v. Scaramuzzino*, 317 A.2d 225, 226 (Pa. 1974)). If the defendant offers to stipulate to the facts shown in the photograph or if the defense does not dispute the testimony that the photographs illustrate, the State's burden is often difficult to meet. *Id.* (citing *People v. Chavez*, 329 P.2d 907, 916 (Cal. 1958); *Poe v. Commonwealth*, 301 S.W.2d 900, 902-03 (Ky. 1957); *People v. Falkner*, 209 N.W.2d 193,194 (Mich. 1973); *State v. Bucanis*, 138 A.2d 739, 743-44 (N.J. 1958)). "As a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted." *State v. Collins*, 986 S.W.2d 13, 21 (Tenn. Crim. App. 1998). In the past, we have acknowledged that "the question of whether a photograph is or is not graphic or gruesome is often a subjective determination, and what may be graphic or gruesome to one person may not be so to another." *State v. Curtis Scott Harper*, No. E2014-01077-CCA-R3-CD, 2015 WL 6736747, at *14 (Tenn. Crim. App. Nov. 3, 2015), *no perm. app. filed*. However, at times, there is no reasonable question about the graphic and gruesome nature of a photograph. *Id.*

In this case, Defendant filed a motion in limine to exclude the photographs of the fetus, and the trial court heard argument on the matter before trial began. During argument, Defendant offered to stipulate that "Ms. Edwina Thomas was six to eight weeks pregnant" and that the unborn child "died." If Defendant's proposed stipulation had been entered, it would have certainly lessened the probative value of the photograph of the fetus, but it would not have erased its probative value.

In his testimony explaining how he determined that Ms. Thomas was pregnant, Dr. Ross described the pictures as follows, "This is the opened uterus. This here represents the amniotic sack. And the fetus is down here in the lower part of the sack." The picture

depicts the "opened uterus" after it had been removed during an autopsy. The "opened uterus" is lying by itself on white background with a ruler to give the picture proper scale. We note that the photograph entered into evidence does not depict anything that resembles a complete human lifeform. Rather, to the untrained eye, it looks like a removed internal organ or a piece of human flesh. Considering Dr. Ross's testimony while reviewing the picture, it doesn't appear that the fetus is even visible in the picture.

Thus, we are left to consider whether a picture of Ms. Thomas's "opened uterus" should have been excluded pursuant to Tennessee Rule of Evidence 403. We conclude that the trial court did not abuse its discretion by admitting the photograph because the photograph aided Dr. Ross in explaining how he determined that Ms. Thomas was pregnant, and the danger of unfair prejudice from a depiction of her "opened uterus" does not outweigh the probative value of the photograph. Unlike the photographs in *Curtis Scott Harper*, which depicted a more fully developed fetus with numerous severe wounds, including a severed head, 2015 WL 6736747, at *14, the photograph in this case was not graphic or gruesome in a way that would unfairly prejudice Defendant because it does not depict anything that would pluck the heartstrings of the jury and cause them to depart form the law and decide the case on an emotional basis.

### B. Mr. Dotson's Gang Affiliation

Defendant argues that the trial court erred when it found that Mr. Dotson's affiliation with the "Fast Cash" gang was irrelevant. Further, Defendant argues that the exclusion of Mr. Dotson's gang affiliation violated her right to present a defense and her right to cross-examine an adverse witness. The State argues that Defendant has waived her constitutional arguments because she raises the issue for the first time on appeal and that the trial court did not abuse its discretion in finding that Mr. Dotson's gang affiliation was irrelevant. We agree with the State

Defendant's motion for new trial and Defendant's amended motion for new trial contain no mention of a violation of Defendant's right to present a defense or Defendant's right to cross-examine an adverse witness. Therefore, any argument regarding the exclusion of this piece of evidence in relation to either of those rights is waived because it is being raised for the first time on appeal. *See State v. Adkisson*, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994) ("The party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court.").

During opening statements, defense counsel mentioned that Mr. Dotson was a member of the "Fast Cash" gang. The State objected and the trial court ruled that defense counsel should "[s]tay away from mentioned anyone in a gang until such time as it's relevant in this case." During a cross-examination of a Ms. Thomas's sister, defense counsel attempted to show a good faith basis for alleging that Mr. Dotson was a member

of the "Fast Cash" gang by entering a police report stating that Mr. Dotson was a "known member" of "Fast Cash." At this juncture, the trial court ruled that Mr. Dotson's gang affiliation was irrelevant. Tennessee Rule of Evidence 401 states that relevant evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." We fail to see how Mr. Dotson's alleged gang membership has any tendency to make it more or less likely that Defendant shot Mr. Tate and Ms. Thomas. Therefore, we hold that the trial court did not abuse its discretion when it excluded Mr. Dotson's alleged gang affiliation.

*C. Ms. Seay's Jail Phone Call*

Defendant argues that the trial court erred by admitting Ms. Seay's jail phone call as a prior consistent statement because the statements were made after Ms. Seay had a reason to fabricate a story. The State contends that Ms. Seay's jail phone call was properly admitted as a prior consistent statement because the jail phone call was made before Ms. Seay entered a memorandum of understanding with the State and on cross-examination, defense counsel had insinuated that Ms. Seay had fabricated her testimony in exchange for favorable treatment. We agree with the State.

"The Tennessee Rules of Evidence do not specifically cover rehabilitation of impeached witnesses, but Tennessee law is well-established." Neil P. Cohen et al., *Tennessee Law of Evidence*, § 8.05[5], n. 170 (6th ed. 2011). A prior statement of a witness, whether consistent or inconsistent with their trial testimony, is hearsay if it is offered for the truth of the matter asserted. *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980) (citing *Mays v. State*, 495 S.W.2d 833 (Tenn. Crim. App. 1972); *Johnson v. State*, 596 S.W.2d 97 (Tenn. Crim. App. 1979)). Generally, a prior consistent statement may not be introduced to rehabilitate an impeached witness. *Braggs*, 604 S.W.2d at 885. However, three exceptions to the general rule exist: (1) a prior consistent statement is admissible to rehabilitate a witness when insinuations of recent fabrication have been made or when deliberate falsehood has been implied; (2) a prior consistent statement is admissible after a witness has been impeached with a prior inconsistent statement that suggests the witness fabricated testimony or testified based upon a faulty recollection; (3) a prior consistent statement is admissible after a witness has been asked specific questions that make a prior statement appear to be inconsistent with the witness's trial testimony. *State v. Robert William Ward*, No. M2017-02269-CCA-R3-CD, 2019 WL 1436151, at *22-23 (Tenn. Crim. App. Apr. 1, 2019), *perm app. denied* (Tenn. July 18, 2019); *see State v. Boyd*, 797 S.W.2d 589, 593 (Tenn. 1990); *State v. Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998); *State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993); *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988).

In cases where the first exception is invoked, like the case at hand, a prior consistent statement is allowed to show that the witness testified consistently with a prior statement made at a time when the witness had no incentive to lie or fabricate a story. *Robert William Ward*, 2019 WL 1436151, at *22 (citing *State v. Sutton*, 291 S.W. 1069, 1070 (Tenn. 1927)). In order for a prior consistent statement to be admissible, the witness's testimony must have been attacked to the point that rehabilitation is necessary. *Id.* (citing *Hodge*, 989 S.W.2d at 725). Statements used for the purpose of rehabilitation are not hearsay by definition because they are not being used to prove the truth of the matter asserted. Cohen et al., *supra*, § 8.01[9]. When a prior consistent statement is admitted, a trial court must, upon request, instruct the jury that the prior consistent statement cannot be used as proof of the truth of the matter asserted in the statement. *Robert William Ward*, 2019 WL 1436151, at *23.

Essentially, this issue boils down to one question: when did Ms. Seay have an incentive to lie or fabricate a story? However, that is a preliminary factual determination made by the trial court prior to the admission of a prior consistent statement. "When called upon to resolve factual issues as predicates to the application of a hearsay rule exception, the trial court may necessarily make credibility determinations and utilize factual inferences, and in such a situation, the appellate court should defer to the trial court's finding of such facts." *State v. Gilley*, 297 S.W.3d 739, 761 (Tenn. Crim. App. 2008). The factual findings of a trial court are binding upon an appellate court unless the evidence in the record preponderates against them. *State v. Berrios*, 235 S.W.3d 99, 103 (Tenn. 2007). Defense counsel argued to the trial judge that the prior consistent statement offered by the State was made after Ms. Seay had an incentive to lie or fabricate a story, and the trial court implicitly rejected that factual argument when it decided to admit the prior consistent statement. The record does not preponderate against the trial court's implicit finding that the prior consistent statement was made before Ms. Seay had a motive to lie or fabricate a story. Therefore, the trial court did not abuse its discretion by admitting Ms. Seay's jail phone call.

### D. Failure to Redact Photograph

Defendant claims that the trial court erred by failing to redact an unknown male from the background of the photograph that Ms. Seay used to identify Defendant. Defendant argues that this was unfairly prejudicial because the unknown male was making "gang signs." The State replies that the trial court properly balanced the probative value of the photograph with the danger of unfair prejudice. The trial court found no prejudicial effect resulting from the admission of the photograph and probative value in using the photograph to identify Defendant. We agree with the State.

As we said above, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" Tenn. R. Evid. 403. The

- 13 -

probative value of the photograph that was admitted as Exhibit 13 is derived from the fact that Ms. Seay used this photograph to identify Defendant on January 23, 2016. As redacted for trial, the photograph depicts only Defendant's upper body and head, and Defendant is standing in front of a man who's right hand is held up with his index finger at approximately forty-five degrees from straight and his remaining fingers approximately ninety degrees from straight. The meaning of that hand sign is unknown to this Court, if the hand sign possesses any meaning at all. Furthermore, Defendant has not presented any evidence explaining the meaning of that hand sign. Therefore, for our consideration, the photograph simply depicts a man with his hand raised. We fail to see how this unfairly prejudiced Defendant. Therefore, the trial court did not abuse its discretion by admitting the photograph without redacting the man with his hand raised.

### III. Continuance

Defendant argues that the trial court erred by not granting Defendant's motion for a continuance and by allowing Mr. Dotson to testify when the State failed to notify Defendant of its intent to call Mr. Dotson as a witness until the first day of trial. The State claims that Defendant knew of Mr. Dotson, as evidenced by the attempts by Defendant's investigator to contact Mr. Dotson. Further, the State argues that the trial court properly exercised its discretion, and the State contends that Defendant has failed to prove that she received an unfair trial or show that the outcome of her trial would have been different had the continuance been granted. We agree with the State and hold that the trial court properly exercised its discretion.

"A motion for continuance is addressed to the sound discretion of the trial judge and his ruling on the motion will not be disturbed in the absence of an abuse of discretion to the prejudice of the defendant." *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995) (citing *State v. Strouth*, 620 S.W.2d 467, 472 (Tenn. 1981)). An abuse of discretion occurs when a trial court's failure to grant a continuance denied the defendant a fair trial or when one could reasonably conclude that a different result would have occurred had the continuance been granted. *Id.*

Tennessee Code Annotated section 40-17-106 directs the district attorney general to list the names of the witnesses that it intends to call at trial on the indictment. The statute's purpose is to prevent a surprise witness at trial. *State v. Demontre Chavez Brown*, No. M2013-02091-CCA-R3-CD, 2014 WL 3748569, at *8 (Tenn. Crim. App. July 30, 2014), *perm. app. denied* (Tenn. Dec. 17, 2014). However, our supreme court has stated that section 40-17-106 is "directory only and does not necessarily disqualify a witness whose name does not appear on the indictment from testifying." *State v. Harris*, 839 S.W.2d 54, 69 (Tenn. 1992) (citing *State v. Street*, 768 S.W.2d 703, 710-11 (Tenn. Crim. App. 1988)). In order to obtain relief, the defendant must show "prejudice, bad faith, or undue advantage" as a result of the State's failure to provide the witness's name

is a timely manner. *Id*. The prejudice suffered by a defendant must result from the untimeliness of the disclosure of the witness's name and not merely from the testimony of the witness. *Demontre Chavez Brown*, 2014 WL 3748569, at *8 (citing *State v. Kendricks*, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996)). We also note that Tennessee Rule of Criminal Procedure 16 does not require nor authorize pretrial discovery of the names and addresses of the State's witnesses. *Id.* (citing *State v. Martin*, 634 S.W.2d 639, 643 (Tenn. Crim. App. 1982)).

In the pre-trial discussion, it was brought to the trial court's attention that the State was calling a witness, Mr. Dotson, that it had not previously disclosed to Defendant and that the State was taking a statement from Mr. Dotson while that discussion was ongoing. The prosecutor revealed that Mr. Dotson's cellphone was in the car that belonged to Ms. Seay. Further, the prosecutor claimed that Defendant was aware of Mr. Dotson because she knew about the recovery of his cellphone. Further, defense counsel admitted that their investigator had spoken to Mr. Dotson over the phone, but Mr. Dotson refused to talk to the investigator. Defense counsel insisted that this last minute investigation by the State prevented them from adequately preparing a defense.

The trial court did not abuse its discretion by denying Defendant's request for a continuance. Just because the State finally made contact with Mr. Dotson on the first day of trial does not mean that Mr. Dotson was a surprise witness. Defense counsel was aware of the existence of Mr. Dotson and had even attempted to contact Mr. Dotson during an independent investigation. Defendant failed to prove that she was prejudiced by an untimely disclosure made by the State. Additionally, there is no evidence that the State acted in bad faith or prevented the defense team from interviewing Mr. Dotson. Ultimately, we see no basis for the conclusion that the outcome would have been different had a continuance been granted.

### IV. Motion for Mistrial

Defendant argues that the trial court erred when it did not grant Defendant's motion for a mistrial in response to Mr. Melvin's testimony that Defendant said she would shoot Mr. Melvin. The State points out Defendant's delay in moving for a mistrial and argues that the trial court properly exercised its discretion when it denied Defendant's motion. We agree with the State that the trial court properly exercised its discretion.

Our supreme court summarized the law regarding appellate review of a trial court's denial of a motion for mistrial by stating the following:

> "The law is well-settled that the decision of whether or not to enter a mistrial rests within the sound discretion of the trial court. This Court will

not interfere with the trial court's decision absent a clear abuse of discretion on the record." *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The party seeking a mistrial has the burden of establishing its necessity. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008).

*State v. Bell*, 512 S.W.3d 167, 187 (Tenn. 2015). When determining whether the trial court should have granted a mistrial based upon testimony that was presented to the jury, we consider three nonexclusive factors: "(1) whether the State elicited the testimony, or whether it was unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof." *Id.* at 188 (quoting *State v. Nash*, 294 S.W.3d 541, 547 (Tenn. 2009)).

Here, the State did not elicit the testimony from Mr. Melvin. Mr. Melvin volunteered this information on cross-examination by defense counsel. In the argument on the motion for mistrial, defense counsel even said that Mr. Melvin had been instructed by the State not to testify that Defendant had said that she would shoot him. No curative instruction was given to the jury, and the trial court determined that the comment was not very prejudicial because of Mr. Melvin's demeanor. The trial court perceived that Mr. Melvin took Defendant's comment as a joke. Additionally, the strength of the State's proof overwhelms this minor aside offered by Mr. Melvin. Therefore, the trial court did not abuse its discretion when it denied Defendant's motion for a mistrial.

### V. Prosecutor's Closing Argument

Defendant argues that the prosecutor intentionally mislead the jury or misstated the evidence, expressed a personal belief or opinion as to the truth or falsity of the evidence, injected broader issues than the guilt or innocence of Defendant, and intentionally referred to or argued facts outside the record. Defendant concedes that no contemporaneous objections were made in the trial court and that plenary review of the issue is waived. However, Defendant requests plain error review. *See* Tenn. R. App. P. 36(a). The State argues that there is no plain error because no clear and unequivocal rule of law was breached, Defendant failed to establish that she did not waive the issue for tactical reasons, and consideration is not necessary to do substantial justice. We agree with the State.

In order to be granted plain error relief, Defendant bears the burden of establishing the following five factors:

> (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

*State v. Minor*, 546 S.W.3d 59, 67 (Tenn. 2018). "If a defendant fails to establish any of these criteria, an appellate court must deny relief under the plain error doctrine, and an appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." *Id*.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing arguments "have special importance in the adversarial process," allowing the parties "to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *Banks*, 271 S.W.3d at 130. Attorneys "should be given great latitude in both the style and the substance of their arguments." *Id*. at 131. However, "a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Id*. Although not exhaustive, this Court has recognized five general categories of improper statements during the prosecution's closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or evidence or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the defendant; or (5) arguing or referring to facts outside the record that are not matters of common knowledge. *See State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). However, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." *Banks*, 271 S.W.3d at 131.

First, Defendant takes issue with the prosecutor saying, "And so the sweatshirt does not belong to Gary Dotson, contrary to what [Defense Counsel] said. There is no proof, there's no witness, that said that that was Gary Dotson's sweatshirt. None. Look at your notes." Defendant claims this was contrary to the evidence presented at trial and points to the following questions and answers during the cross-examination of Sergeant Smith at trial:

Q. Now, during the course of this investigation, you knew that a man named Gary Dotson, his name had come up?

A. His name had come up with the print identified on the iPhone. That's correct.

Q. Did his name also come up in connection with the sweatshirt?

A. The name – I don't – I don't recall his specific name coming up with the sweatshirt. It seemed like the name Gary came up as being associated with Victoria.

Q. So it just came back – it just come back that it – the name Gary only came back with the sweatshirt?

A. Yes, ma'am. That's correct.

Defendant also points to statements made by a prosecutor during a pre-trial discussion about the State calling Mr. Dotson as a witness. In that discussion, a prosecutor said, "[A] sweatshirt also that belonged to Gary Dotson had this [D]efendant's – has the victim's, rather, blood on it." At another time, a prosecutor said "the sweatshirt belonged to him," and the trial court inquired, "Do we know that the sweatshirt belonged to him[?]" The prosecutor responded, "Yes. That's why she sent it off."

The answers given by Sergeant Smith are inconsistent. First, he doesn't remember a specific name associated with the sweatshirt, but next, he agrees that Mr. Dotson's name was associated with the sweatshirt. From the proof put on at trial, it is at best unclear if the sweatshirt belonged to Mr. Dotson. Thus, Defendant has failed to prove that the prosecutor intentionally misstated the evidence or mislead the jury, and Defendant has failed to prove that a clear and unequivocal rule of law was breached. While it is disturbing that the prosecutor stated that the sweatshirt belonged to Mr. Dotson outside of the presence of the jury and then stated the opposite during rebuttal closing argument, we need not address the ethical implications of this disparity because we do not perceive the statements as being so inflammatory or improper that it affected the outcome of the trial.

Next, Defendant points to the prosecutor saying, "And so [Defense Counsel] says well, they didn't find any blood or mud on my client's boots. [Defendant] wasn't arrested until February the 6th, 2016, a few weeks after this shooting. Of course they wouldn't find anything." Defendant claims that this statement contradicts Officer Garey's testimony that the BlueStar test should have detected blood on Defendant's boots after the lapse of time that occurred even if the boots had been cleaned. Officer Garey

only stated that the BlueStar test *should* detect blood after it had been cleaned off. He did not say that the BlueStar test *would* detect blood that had been cleaned off or that the BlueStar test always detects blood that had been removed. As such, Defendant has failed to prove that the prosecutor misstated the evidence in the case by insinuating that Defendant cleaned her boots between the day of the crime and the day that she was arrested. Furthermore, we do not perceive the statements as being so inflammatory or improper that it affected the outcome of the trial, and no clear and unequivocal rule of law was breached when the prosecutor made the statements.

Defendant also claims that the prosecutor expressed a personal belief when saying, "You know, poor Gary Dotson. He just left his fingerprint in a car on a phone that probably had been in that car several days. But just because his print . . . they, at least according to the Defense, he's an automatic suspect, even though he had nothing to do with the killing." We view this statement as a rebuttal of Defendant's theory that Mr. Dotson was the perpetrator and not an expression of a personal belief of the prosecutor, and even still, the statements would not have affect the outcome of the trial. Thus, no clear and unequivocal rule of law was breached.

Defendant argues that the prosecutor injected a broader issue than innocence or guilt by saying, "Now, this is not just [Defendant's] day in court. This is also Eddie Tate's day in court. This is also Edwina Thomas's day in court." Defendant also points to the prosecutor saying, "With a verdict of guilty on all four of these counts, you can write the final chapter to the story of Edwina Thomas and Eddie Tate by finding her guilty as charged." We agree that these statements tend to deviate from the guilt or innocence of Defendant. Such an argument is similar to the argument this Court found improper in *State v. Jonathan C. Buckner*, No. M2016-01162-CCA-R3-CD, 2017 WL 3476068, at *13 (Tenn. Crim. App. Aug. 14, 2017), *perm. app. denied* (Tenn. Dec. 6, 2017), where the prosecutor asked the jury to do the victim a "favor" by finding Defendant guilty. We find the argument made by the prosecutor to write the "final chapter" of the victims' story to be improper. Like we advised in *Jonathan C. Buckner*, the trial court should have interjected, admonished the prosecutor, and instructed the jurors accordingly. However, in light of the ample evidence of Defendant's guilt, we do not perceive the statements as being so inflammatory or improper that it affected the outcome of the trial, and we conclude that plain error relief is not warranted because none of Defendant's substantial rights were affected.

Defendant contends that the prosecutor intentionally referred to or argued facts outside of the record by saying, "You know, there's one thing we learn as children, is that we should accept our responsibility. You know, the choices that we make, we have to bear the responsibility for them." Put simply, we conclude that this generic statement about taking responsibility for one's actions does not fall within the ambit of the term "facts outside the record." The prosecutor's statement did not refer to a fact, but rather, a

simple anecdote.  Therefore, the prosecutor's conduct was not improper, and no clear and unequivocal rule of law was breached.

## VII.  Cumulative Error

Defendant also argues that the cumulative effect of the errors in this case warrant relief.  Our supreme court has described the cumulative error doctrine as follows:

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

*State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015) (quoting *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010)).  Since there was only one error by the trial court that we have already determined did not affect the outcome of the trial, there are not multiple errors to aggregate for the purpose of the cumulative error doctrine.

## VIII.  Consecutive Sentencing

Defendant claims that the trial court failed to properly consider the factors found in *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995), when imposing consecutive sentences and that the trial court simply imposed consecutive sentencing because the court believed that Defendant should have been convicted for first degree murder on all counts.  The State argues that the trial court properly exercised its discretion by imposing consecutive sentences and that while the trial court did not explicitly mention the second *Wilkerson* factor, it did provide numerous reasons for imposing consecutive sentencing.

Generally, we review the imposition of consecutive sentencing using an abuse of discretion standard accompanied by a presumption of reasonableness.  *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013).  However, the trial court is only afforded a presumption of reasonableness "if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)."  *Id.* at 861.  To impose a consecutive sentence, a trial court must find one of the following grounds by a preponderance of the evidence:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;

- 20 -

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). "Any one of these grounds is a sufficient basis for the imposition of consecutive sentences." *Pollard*, S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)). However, if a trial court chooses to base the imposition of consecutive sentencing on ground (4), the "dangerous offender" classification, then the trial court must also conclude that the aggregate sentence is "'reasonably related to the severity of the offenses'" and "'necessary in order to protect the public from further criminal acts.'" *Pollard*, 432 S.W.3d at 863 (quoting *Wilkerson*, 905 S.W.2d at 938). This Court has two options if the trial court has failed to properly consider the *Wilkerson* factors on the record: "(1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." *Id.* at 864.

Here, the trial court decided to run Defendant's sentences consecutively based upon ground (4) and sufficiently addressed his determination that Defendant was a dangerous offender whose behavior indicates no regard for human life. However, the trial court did not take the next step and address the factors set forth in *Wilkerson*. Accordingly, we elect to conduct a de novo review to apply the *Wilkerson* factors for imposing consecutive sentences.

Defendant's actions took three lives: Mr. Tate's, Ms. Thomas's, and Ms. Thomas's unborn child's. Defendant took those lives in a brutal fashion by riddling Mr. Tate's car with six bullets. When run consecutively, her total effective sentence is only thirty years. Given the tremendous severity of the offenses, we conclude that a sentence of thirty years is reasonable. Additionally, a thirty-year sentence is necessary to protect the public from Defendant. She killed three people, and from the record we can only surmise that she did so because she wanted a refund for her hair weave. That type of behavior is gravely dangerous, and Defendant must be incarcerated to protect the public from Defendant's actions.

## Conclusion

For the aforementioned reasons, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE